IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF NEW YORK

UNITED STATES OF AMERICA,

v.

14-CR-6147EAW

MUFID A. ELFGEEH,

Defendant.

## PLEA AGREEMENT

The defendant, **MUFID A. ELFGEEH**, and the United States Attorney for the Western District of New York (hereinafter "the government") hereby enter into a plea agreement with the terms and conditions as set out below.

### I. THE PLEA AND POSSIBLE SENTENCE

1. The defendant agrees to plead guilty to Counts 2 and 3 of the Indictment, each of which charges a violation of Title 18, United States Code, Section 2339B(a)(1) (attempting to provide material support to a designated foreign terrorist organization), for which the maximum possible sentence for each count is a term of imprisonment of 15 years, a fine of $250,000, a mandatory $100 special assessment, and a term of supervised release of life. The defendant understands that the penalties set forth in this paragraph are the maximum penalties that can be imposed by the Court at sentencing.

2. The defendant understands that, if it is determined that the defendant has violated any of the terms or conditions of supervised release, the defendant may be required

to serve in prison all or part of the term of supervised release, up to 4 years, without credit for time previously served on supervised release. As a consequence, in the event the defendant is sentenced to the maximum term of incarceration, a prison term imposed for a violation of supervised release may result in the defendant serving a sentence of imprisonment longer than the statutory maximum set forth in ¶ 1 of this agreement.

## II.     ELEMENTS AND FACTUAL BASIS

3.     The defendant understands the nature of the offenses set forth in ¶ 1 of this agreement and understands that, if this case proceeded to trial, the government would be required to prove beyond a reasonable doubt the following elements of the crimes:

- a. that the defendant knowingly attempted to provide material support or resources, that is, personnel, to a foreign terrorist organization, namely, the Islamic State of Iraq and the Levant (ISIL);

- b. that the defendant knew that the organization was a designated foreign terrorist organization, or that the organization had engaged or was engaging in terrorist activity or terrorism; and

- c. that the defendant is a United States national.

The defendant further understands that a conviction for attempt requires proof that the defendant (a) had the intent to commit the object crime, and (b) engaged in conduct amounting to a substantial step toward its commission. A substantial step must be something more than mere preparation, but may be less than the last act necessary before the actual commission of the substantive crime.

## FACTUAL BASIS

4. The defendant and the government agree to the following facts, which form the basis for the entry of the pleas of guilty including relevant conduct:

a. Beginning in or about December 2013, and continuing until on or about May 31, 2014, in Rochester, in the Western District of New York, the defendant, **MUFID A. ELFGEEH** (hereinafter "ELFGEEH"), a citizen of the United States, did knowingly attempt to provide material support and resources, that is, personnel (including Individual A, Individual B, Individual C, and a group of fighters located in Syria), to a designated foreign terrorist organization, namely the Islamic State of Iraq and the Levant (ISIL), knowing that ISIL was a designated foreign terrorist organization, and had engaged, and was engaging, in terrorist activity and terrorism.

### The Islamic State of Iraq and the Levant (ISIL)

b. On October 15, 2004, the United States Secretary of State designated al-Qa'ida in Iraq (AQI), then known as Jam'at al Tawhid wa'al-Jihad, as a Foreign Terrorist Organization (FTO) under Section 219 of the Immigration and Nationality Act. Subsequently, on May 15, 2014, the Secretary of State amended the designation of AQI as an FTO under Section 219 of the Immigration and Nationality Act to add the alias Islamic State of Iraq and the Levant (ISIL) as its primary name, and various other aliases, including the Islamic State of Iraq and Syria (ISIS), the Islamic State of Iraq and al-Sham, ad-Dawla al-Islamiyya fi al-'Iraq wa-sh-Sham, Daesh, and Dawla al Islamiya. Thus, ISIL has been a designated FTO continuously since October 15, 2004. In an audio recording publicly released on June 29, 2014, ISIL announced a formal change of ISIL's name to "the Islamic State."

### ELFGEEH's Support of ISIL and Violent Jihad

c. From in or about early 2013, and continuing until May 31, 2014, ELFGEEH maintained numerous social media accounts (including three Twitter accounts, 23 Facebook accounts, and a WhatsApp account), which he used as platforms to receive and disseminate information about foreign terrorist groups and their activities in Syria and other countries; to declare his support for violent jihad, ISIL and other foreign terrorist groups, and foreign terrorist leaders (including Abu Bakr al-Baghdadi, the current leader of ISIL); to inspire and encourage others to engage in violent jihad and/or pledge allegiance to ISIL and other foreign terrorist groups; to declare his support for establishment of the Islamic State; and to seek financial contributions to assist

jihadist fighters. ELFGEEH opened and maintained his social media accounts under various aliases to conceal his true identity and thereby avoid detection by government and law enforcement authorities, and avoid having his accounts shutdown by Facebook due to the nature of his postings.

d. At all times relevant to this case, ELFGEEH was living in Rochester, New York, and knew that ISIL was a designated foreign terrorist organization, and that ISIL had engaged in, and was engaging in, terrorist activity and terrorism.

### Individuals A and B

e. In late 2013, ELFGEEH wanted to be a source of support for violent jihad and serve as a facilitator for violent jihadists who wanted to travel overseas and fight. In ELFGEEH's own postings and messages on social media, and statements to Individual A, ELFGEEH stated that a person who helps or sponsors a fighter to engage in violent jihad obtains the same religious rewards from Allah (God) as the fighter himself.

f. In December 2013, ELFGEEH began actively recruiting Individuals A and B – both of whom, unbeknownst to ELFGEEH, were cooperating with the Federal Bureau of Investigation (FBI) at the time – to travel to Syria to join and fight with ISIL. Earlier in 2013, before Individual B began cooperating with the FBI, ELFGEEH had encouraged Individual B to travel overseas and engage in violent jihad with terrorist groups in Syria and Yemen.

g. On April 8, 2014, based on ELFGEEH's repeated recruitment efforts, Individual A told ELFGEEH that he had decided to make a flight reservation and travel to Syria to join ISIL by June 1 (2014). Two days later, ELFGEEH advised Individual B that someone (referring to Individual A) was leaving for Syria. ELFGEEH told Individual B that it was a "big opportunity," and that, if Individual B traveled to Syria, Individual B would join ISIL. ELFGEEH stated to Individuals A and B that he would find and arrange for a trustworthy ISIL contact in Syria for them.

h. In April and May 2014, ELFGEEH took several actions to assist Individuals A and B with preparing for their travel to Syria to join ISIL, including, but not limited to, the following:

   i. On April 19, 2014, ELFGEEH sent a text message to Individual B containing a link to an ISIL propaganda video. The video depicted a gathering in Syria of ISIL members from foreign countries (including Saudi Arabia, Russia, Egypt, and Jordan), wearing combat gear,

carrying assault weapons, and displaying the black flag used by ISIL. The ISIL members, among other things, urged other Muslims to join ISIL and threatened to destroy the "tyrants" in Canada and the United States. The video also showed ISIL members attacking a police barracks in Saleh al din province in Iraq.

ii. On April 27, 2014, ELFGEEH posted an ISIL propaganda video on Individual B's Facebook page. The video depicted an ISIL member in Syria wearing a black balaclava and holding an assault rifle equipped with a silencer. In the video, the ISIL member called for Muslims around the world to travel to Syria and assist ISIL in whatever capacity they could. The ISIL member stated that they needed help from individuals willing to engage in combat, but also from individuals able to help with medicine and finances. The ISIL member urged Muslims to leave countries controlled by the enemies of Allah (God) and join ISIL in Syria, and said that ISIL had conquered many cities and was implementing Sharia law.

iii. In April 2014, ELFGEEH arranged for an English-speaking ISIL contact to communicate with Individual B over Facebook about the state of affairs in Syria. The ISIL contact – an Egyptian national located in Iraq – exchanged a series of Facebook messages with Individual B, during which they discussed Individual B's travel to Syria via Turkey.

iv. In preparation for the trip to Syria, ELFGEEH paid a total of more than $240 for Individual B to obtain a birth certificate, passport photographs, and an expedited passport. ELFGEEH also purchased a laptop computer and a high-definition action camera for Individuals A and B to take to Syria. ELFGEEH believed that ISIL members would use the camera during an attack to "record the action."

v. ELFGEEH counseled Individuals A and B to dress like tourists and use matching cover stories (relating to their destination, the reason for their travel, and the duration of their stay) during the trip to avoid drawing suspicion from government and law enforcement authorities at the airports.

vi. ELFGEEH advised Individuals A and B about the process for joining ISIL in Syria. In sum and substance, he told them that, when they first arrived in Syria, they would stay at a "guesthouse" for two or three months, where they would receive education and training, and ISIL would get to know them and ensure that they were not spies.

ELFGEEH said Individuals A and B would stay at the guesthouse until they passed all the tests and obtained ISIL's approval.

i. ELFGEEH told Individual A that, in light of Individual A's experience operating heavy machinery and weapons training as a soldier in the Jordanian army, ISIL would make him part of a core group of specially trained military personnel able to assume control and to train others. In addition, ELFGEEH told Individual B that, in light of Individual B's patience, he thought ISIL would use Individual B to operate a cannon, act as a sniper and/or build bombs.

j. In May 2014, Individual A purchased an airline ticket to Istanbul, Turkey, for Individual B, with a departure date of June 2, 2014. (Individual A did not purchase a ticket for himself, but represented to ELFGEEH that he had a ticket for the same flight). ELFGEEH gave the airline ticket to Individual B.

k. In late April and May 2014, ELFGEEH used Facebook and WhatsApp to contact several individuals overseas (including a Chechen national in Turkey, a Jordanian national in Syria, and two Yemeni nationals in Yemen) in search of an ISIL member who could coordinate the logistics of the trip and the admission of Individuals A and B into ISIL-controlled territory. ELFGEEH eventually focused his efforts on a Yemeni national in Yemen, who was affiliated with ISIL. In a series of WhatsApp messages in late May 2014, ELFGEEH told the Yemeni national that he had "two brothers" (Individuals A and B) who would be traveling to Syria to join ISIL. ELFGEEH vouched for the trustworthiness of Individuals A and B to the Yemeni national. The Yemeni national, a known jihadist in Yemen, agreed to coordinate the travel for Individuals A and B to Syria. The Yemeni national also sought money from ELFGEEH to finance the travel of two Yemen-based jihadists to Syria. ELFGEEH told the Yemeni national that he would finance the travel of any individuals to Syria, but only if they already had their visas. ELFGEEH wanted to avoid the issue he had with Individual C where he sent $600 to Individual C to travel from Yemen to Syria, but Individual C could not get his visa to Turkey.

l. In a series of WhatsApp messages in late May 2014, the Yemeni national told ELFGEEH that he had contacted an ISIL member, who told the Yemeni national that the path for Individuals A and B to travel to Syria was available. ELFGEEH told the Yemeni national that the travel date was near and he needed a "recommendation" for Individuals A and B, meaning that he needed someone overseas who could vouch for them. ELFGEEH told the Yemeni national that he recommended Individuals A and B. Based on that representation, the Yemeni national agreed to recommend them to ISIL. The

Yemeni national described the process for Individuals A and B to get to Syria to join ISIL, stating that they would first travel to Istanbul, Turkey, and then take a flight to Gaziantep, Turkey, which is a city in southeast Turkey near the northern border of Syria. After they arrived in Gaziantep, Individuals A and B would communicate with the Yemeni national and he would put them in contact with ISIL in Syria. The Yemeni national confirmed that the plans were ready for Individuals A and B to travel to Syria to join ISIL.

m. On May 28, 2014, ELFGEEH gave Individual A the Yemen-based telephone number for the Yemeni national. ELFGEEH told Individual A that the Yemeni national would be the contact for Individuals A and B during their trip to Syria. ELFGEEH described the logistics of the trip to Individual A, stating that Individuals A and B would first travel to Istanbul and then take a flight to Gaziantep. ELFGEEH instructed Individual A to contact the Yemeni national at the telephone number provided by ELFGEEH when they arrived in Istanbul or Gaziantep, and reminded Individual A to be security conscious when communicating with the Yemeni national. ELFGEEH told Individual A that the Yemeni national knows a lot of people in Syria, and has been involved in sending jihadists to Syria for a long time.

n. In a series of WhatsApp messages on May 28, 2014, ELFGEEH told the Yemeni national that he "targeted [Individual B] and the cause and means worked and he sought guidance and finally accepted the proposition," meaning that ELFGEEH had sought to radicalize Individual B (a Muslim convert) and convince Individual B to travel overseas to engage in violent jihad, and that it worked. ELFGEEH told the Yemeni national that Individuals A and B would be traveling on June 2 (2014). The Yemeni national told ELFGEEH to contact him when their flight departs so he could be prepared for their arrival.

o. Beginning in or about February 2014, and continuing until May 31, 2014, ELFGEEH sought to purchase a firearm equipped with a silencer from Individual B. On May 29, 2014, ELFGEEH gave Individual B $1,050 in cash to purchase two handguns equipped with silencers and ammunition. Two days later, on May 31, 2014, ELFGEEH met with Individual B and took possession of the two handguns equipped with silencers and ammunition. Immediately thereafter, members of the Rochester Joint Terrorism Task Force arrested ELFGEEH.

### Individual C

p. In February 2014, ELFGEEH became aware that Individual C, a Yemeni male located in Yemen, needed $1,500 to finance Individual C's travel from Yemen to Syria to join and fight with ISIL. ELFGEEH knew at

the time that ISIL needed both personnel and money. Thereafter, ELFGEEH made efforts to gather funds to send to Individual C. On February 12, 2014, ELFGEEH showed a photograph of Individual C to Individual A and told Individual A that Individual C wanted to join ISIL and needed their support. ELFGEEH told Individual A that he (ELFGEEH) would get $500 to send to Individual C, and asked Individual A to find one or two others who would be willing to contribute money.

q. On February 22, 2014, ELFGEEH sent $600 via Western Union from Rochester, New York, to Individual C in Aden, Yemen. ELFGEEH sent the money to Individual C for the specific purpose of assisting Individual C in traveling from Yemen to Syria (through Turkey) to join and fight with ISIL. After ELFGEEH sent the money to Individual C, Individual A exchanged Facebook messages with Individual C. In those messages, Individual C told Individual A, using coded language, that he would travel from Yemen to Syria as soon as he received his travel visa.

r. In late February 2014, ELFGEEH told Individual C to either go to Syria to fight with ISIL or, if he could not arrange travel to Syria, then use the money that ELFGEEH sent to buy a weapon, stay in Yemen and fight with a militant group in his area. In or about early March 2014, ELFGEEH learned that Individual C was unable to obtain a visa to Turkey.

### Group of Fighters Located in Syria

s. In March 2014, ELFGEEH communicated with a Syrian national who purported to be the military commander of a battalion of fighters located in Homs, Syria. At the time, the battalion was blockaded in Homs and cut off from other active fighting units, and needed military support (including ammunition, mortar shells, and explosives that could penetrate armored vehicles) to break the blockade. From March through May 2014, ELFGEEH took steps to facilitate communication and coordination between the commander and ISIL leadership for the purpose of the commander and his battalion pledging their allegiance to and joining ISIL.

### III. SENTENCING GUIDELINES

5. The defendant understands that the Court must consider but is not bound by the Sentencing Guidelines (Sentencing Reform Act of 1984).

## BASE OFFENSE LEVEL

6.  The government and the defendant agree that Guidelines §§ 3D1.2(b) and 2M5.3(a) apply to the offenses of conviction and provide for a base offense level of 26.

## SPECIFIC OFFENSE CHARACTERISTICS

7.  The government and the defendant agree that the following specific offense characteristic does apply:

    a. the 2-level increase pursuant to Guidelines § 2M5.3(b)(1)(E) (offense involved provision of material support and resources with the intent, knowledge or reason to believe they are to be used to commit or assist in the commission of a violent act).

## U.S.S.G. CHAPTER 3 ADJUSTMENTS

8.  The government and the defendant agree that the following adjustment to the base offense level does apply:

    a. The 12-level upward adjustment of Guidelines § 3A1.4(a) (offense is a felony that involved or was intended to promote a federal crime of terrorism).

## ADJUSTED OFFENSE LEVEL

9.  Based on the foregoing, it is the understanding of the government and the defendant that the adjusted offense level for the offenses of conviction is 40.

## ACCEPTANCE OF RESPONSIBILITY

10. At sentencing, the government agrees not to oppose the recommendation that the Court apply the two (2) level downward adjustment of Guidelines § 3E1.1(a) (acceptance of responsibility) and further agrees to move the Court to apply the additional one (1) level downward adjustment of Guidelines § 3E1.1(b), which would result in a total offense level of 37.

## CRIMINAL HISTORY CATEGORY

11. Based on the application of Guidelines § 3A1.4(b), it is the understanding of the government and the defendant that the defendant's criminal history category is VI.

## GUIDELINES' APPLICATION, CALCULATIONS AND IMPACT

12. It is the understanding of the government and the defendant that, with a total offense level of 37 and criminal history category of VI, and taking into account the statutory maximum penalties, the defendant's sentencing range would be a term of imprisonment of 360 months, a fine of $20,000 to $200,000, a $200 special assessment, and a period of supervised release of 1 year to life. Notwithstanding this, the defendant understands that at sentencing the defendant is subject to the maximum penalties set forth in ¶ 1 of this agreement.

13. Notwithstanding the above calculations, it is the agreement of the parties pursuant to Rule 11(c)(1)(C) of the Federal Rules of Criminal Procedure that, based on the

factors in Title 18, United States Code, Section 3553(a), the Court at the time of sentence impose a sentence of **270 months imprisonment** as part of the appropriate sentence in this case. If, after reviewing the Pre-Sentence Investigation Report, the Court rejects this agreement, the parties will be relieved of their obligations under this agreement and the defendant shall then be afforded the opportunity to withdraw the pleas of guilty. This agreement does not affect the amount of a fine or the length and conditions of a term of supervised release that may be imposed by the Court at sentencing.

14. The government and the defendant agree to the Sentencing Guidelines calculations set forth in this agreement and neither party will advocate or recommend the application of any other Guideline, or move for any Guidelines departure, or move for or recommend a sentence outside the Guidelines, except as specifically set forth in this agreement. A breach of this paragraph by one party will relieve the other party of any agreements made in this plea agreement with respect to sentencing motions and recommendations. A breach of this paragraph by the defendant shall also relieve the government from any agreements to dismiss or not pursue additional charges.

15. The defendant understands that, except as set forth in ¶ 13, above, the Court is not bound to accept any Sentencing Guidelines calculations set forth in this agreement and the defendant will not be entitled to withdraw the pleas of guilty based on the sentence imposed by the Court.

## IV. STATUTE OF LIMITATIONS

16. In the event the defendant's pleas of guilty are withdrawn, or convictions vacated, either pre- or post-sentence, by way of appeal, motion, post-conviction proceeding, collateral attack or otherwise, the defendant agrees that any charges dismissed pursuant to this agreement shall be automatically reinstated upon motion of the government and further agrees not to assert the statute of limitations as a defense to any other criminal offense involving or related to providing, and attempting and/or conspiring to provide, material support to a designated foreign terrorist organization, attempted murder, illegal possession of firearms and firearm silencers, and assault, which is not time barred as of the date of this agreement. This waiver shall be effective for a period of six months following the date upon which the withdrawal of the guilty pleas or vacating of the convictions becomes final.

## V. GOVERNMENT RIGHTS AND RESERVATIONS

17. The defendant understands that the government has reserved the right to:

a. provide to the Probation Office and the Court all the information and evidence in its possession that the government deems relevant concerning the defendant's background, character and involvement in the offense charged, the circumstances surrounding the charge and the defendant's criminal history;

b. respond at sentencing to any statements made by the defendant or on the defendant's behalf that are inconsistent with the information and evidence available to the government;

c. advocate for a specific sentence consistent with the terms of this agreement, including the amount of a fine and the method of payment, and the length and conditions of a term of supervised release; and

d.  modify its position with respect to any sentencing recommendation or sentencing factor under the Guidelines including criminal history category, in the event that subsequent to this agreement the government receives previously unknown information, including conduct and statements by the defendant subsequent to this agreement, regarding the recommendation or factor.

18.  At sentencing, the government will move to dismiss the open counts of the Indictment in this action and the counts pending in Indictment Number 15-CR-6052EAW.

19.  The defendant agrees that any financial records and information provided by the defendant to the Probation Office, before or after sentencing, may be disclosed to the United States Attorney's Office for use in the collection of any unpaid financial obligation.

## VI. APPEAL RIGHTS

20.  The defendant understands that Title 18, United States Code, Section 3742 affords a defendant a limited right to appeal the sentence imposed. The defendant, however, knowingly waives the right to appeal and collaterally attack any component of a sentence imposed by the Court, which falls within or is less than the sentencing range for imprisonment, a fine and supervised release set forth in Section III, ¶ 12, above, notwithstanding the manner in which the Court determines the sentence. In the event of an appeal of the defendant's sentence by the government, the defendant reserves the right to argue the correctness of the defendant's sentence.

21. The defendant understands that by agreeing not to collaterally attack the sentence, the defendant is waiving the right to challenge the sentence in the event that in the future the defendant becomes aware of previously unknown facts or a change in the law which the defendant believes would justify a decrease in the defendant's sentence.

22. The government waives its right to appeal any component of a sentence imposed by the Court which includes a term of imprisonment of 270 months and which falls within or is greater than the sentencing range a fine and supervised release set forth in Section III, ¶ 12, above, notwithstanding the manner in which the Court determines the sentence. However, in the event of an appeal from the defendant's sentence by the defendant, the government reserves its right to argue the correctness of the defendant's sentence.

## VII. FORFEITURE PROVISIONS

23. The defendant acknowledges that the he is the owner and/or exercised dominion and control of the firearms, firearm silencers and ammunition described below, and agrees to the immediate entry of a <u>Preliminary Order of Forfeiture</u> pursuant to Title 18, United States Code, Sections 924(d), 3665 and Title 28, United States Code, Section 2461(c) against the following property:

   a. one Walther PPK/S, .32 caliber handgun, and firearm silencer, seized from the defendant on May 31, 2014;

   b. one Glock, Model 26, 9 mm handgun, and firearm silencer, seized from the defendant on May 31, 2014;

c.  100 rounds of Winchester 124 grain, 9mm ammunition, seized from the defendant on May 31, 2014;

d.  50 rounds of Winchester, .32 caliber ammunition, seized from the defendant on May 31, 2014; and

e.  50 rounds of Remington, .32 automatic ammunition, seized from the defendant on May 31, 2014.

24.  After the acceptance of the defendant's guilty pleas, and pursuant to Rule 32.2(b)(2) of the Federal Rules of Criminal Procedure, the Court will issue a Preliminary Order of Forfeiture for the items listed above. The defendant hereby waives any right to notice of such Preliminary Order of Forfeiture. The defendant further consents and agrees that the Preliminary Order of Forfeiture and a Final Order of Forfeiture shall issue and become final as to the defendant prior to sentencing and agrees that it shall be made part of the defendant's sentence and included in the judgment pursuant to Rule 32.2(b)(4) of the Federal Rules of Criminal Procedure. The defendant further agrees to waive any time restrictions or requirements as provided in Title 18, United States Code, Section 983, any notice provisions in Rules 32.2 and 43(a) regarding notice of the forfeiture in the charging instrument, announcement of the forfeiture at sentencing, and incorporation of the forfeiture in the judgment. The defendant acknowledges that the defendant understands that the forfeiture of property is part of the sentence that may be imposed in this case and waives any failure by the Court to advise the defendant of this, pursuant to Rule 11(b)(1)(J), at the time the guilty plea is accepted. Forfeiture of the defendant's property shall not be treated as satisfaction of any fine, restitution, cost of imprisonment, or any other penalty the Court may impose upon the defendant in addition to forfeiture.

25. The defendant knowingly, intelligently, and voluntarily waives his right to a jury trial on the forfeiture of these assets. The defendant knowingly, intelligently, and voluntarily waives all constitutional, legal and equitable defenses to the forfeiture of these assets in any proceeding, including any jeopardy defense or claim of double jeopardy, whether constitutional or statutory, as to this criminal proceeding or any related civil or administrative proceeding. The defendant further agrees to waive any claim or defense under the Eighth Amendment to the United States Constitution, including any claim of excessive fine regarding the forfeiture of assets by the United States.

26. The defendant agrees that forfeiture of the aforementioned property as authorized herein shall not be deemed an alteration of the defendant's sentence. Forfeiture of the defendant's assets shall not be treated as satisfaction of any fine, restitution, cost of imprisonment, or any other penalty this court may impose upon the defendant in addition to forfeiture.

27. The defendant freely, voluntarily, knowingly, and intelligently waives any right to appeal or collaterally attack any matter in connection with this prosecution and sentence, including the forfeiture of assets as provided in this agreement.

28. The defendant agrees that the above-described property is subject to forfeiture and/or abandonment, and waives any and all statutory and constitutional rights, including but not limited to time restrictions and notice provisions with respect to the final disposition

or forfeiture of the above property. The defendant further agrees to the destruction of the aforementioned property.

29. In the event the defendant is allowed to withdraw the pleas of guilty or in the event this agreement is voided by the Court, it is expressly agreed and understood that the agreement for the forfeiture and disposition of property is binding upon the defendant and survives the voiding of this agreement.

## VIII. TOTAL AGREEMENT AND AFFIRMATIONS

30. This plea agreement represents the total agreement between the defendant, **MUFID A. ELFGEEH**, and the government. There are no promises made by anyone other than those contained in this agreement. This agreement supersedes any other prior agreements, written or oral, entered into between the government and the defendant.

WILLIAM J. HOCHUL, JR.
United States Attorney
Western District of New York

BY: _____
BRETT A. HARVEY
Assistant United States Attorney

Dated: December 17, 2015

BY: _____
FRANK H. SHERMAN
Assistant United States Attorney

Dated: December 17, 2015

I have had this agreement, which consists of 18 pages, read to me. I have had a full opportunity to discuss this agreement with my attorney, MARK D. HOSKEN, Esq. I agree that it represents the total agreement reached between myself and the government. No promises or representations have been made to me other than what is contained in this agreement. I understand all of the consequences of my pleas of guilty. I fully agree with the contents of this agreement. I am signing this agreement voluntarily and of my own free will.

_____  
MUFID A. ELFGEEH  
Defendant  
Dated: December 17, 2015

_____  
MARK D. HOSKEN, ESQ.  
Attorney for the Defendant  
Dated: December 17, 2015

I, _____Marwan Abdel-Rahman_____, hereby affirm under penalty of perjury that I am an Arabic Interpreter and that I have carefully and fully translated the entire plea agreement (set forth above) to the defendant, **MUFID A. ELFGEEH**; further that the defendant has indicated to me that the defendant understands the terms of this plea agreement and that by signing this agreement, the defendant agrees to all of its terms and conditions; the defendant has further specifically acknowledged to me that the defendant is signing the agreement voluntarily and after full consultation with the defendant's attorney, MARK D. HOSKEN, Esq.

Dated: December 9, 2015.

_____  
Interpreter