IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF NEW YORK

UNITED STATES OF AMERICA

v.  14-CR-6147EAW

MUFID A. ELFGEEH,

        Defendant.

# GOVERNMENT'S SENTENCING MEMORANDUM

The United States of America, by and through its attorneys, William J. Hochul, Jr., United States Attorney for the Western District of New York, and Brett A. Harvey, Assistant United States Attorney, hereby makes and files its sentencing memorandum for the defendant, MUFID A. ELFGEEH.

### I.    FACTUAL AND PROCEDURAL BACKGROUND

**A.    Procedural History**

On September 16, 2014, a federal grand jury returned a seven-count Indictment (14-CR-6147) charging the defendant, MUFID A. ELFGEEH, with various offenses (hereinafter "the Indictment"). Count 1 through 3 each charged the defendant with attempting to provide material support and resources – consisting of personnel – to a designated foreign terrorist organization, the Islamic State of Iraq and the Levant (ISIL) a/k/a the Islamic State of Iraq and Syria a/k/a ad-Dawla al-Islamiya fi al-'Iraq wa-sh-Sham a/k/a Daesh, in violation of 18 U.S.C. § 2339B(a)(1). Count 4 charged the defendant with

attempting to kill officers and employees of the United States, in violation of 18 U.S.C. §§ 1114(3) and 1113. Count 5 charged the defendant with possessing firearms equipped with silencers in furtherance of a crime of violence, in violation of 18 U.S.C. §§ 924(c)(1)(A) and 924(c)(1)(B)(ii). Counts 6 and 7 each charged the defendant with receipt and possession of unregistered firearm silencers, in violation of 26 U.S.C. §§ 5841, 5861(d) and 5871.[1]

On December 17, 2015, the defendant pleaded guilty, under a written plea agreement, to Counts 2 and 3 of Indictment 14-CR-6147. Pursuant to FED.R.CR.P.11(c)(1)(C), the plea agreement calls for an agreed-upon sentence of 270 months imprisonment, contingent upon acceptance by the Court. The defendant is scheduled to be sentenced by this Court on March 17, 2016, at 2:00 p.m.

B. **Summary of Offenses and Relevant Conduct**[2]

In 2013, the defendant became a fervent online supporter of ISIL. The defendant maintained numerous social media accounts (including three Twitter accounts, 23 Facebook accounts, and a WhatsApp account), which he used as platforms to receive and disseminate information about foreign terrorist groups and their activities in Syria and other countries; to declare his support for violent jihad, ISIL and other foreign terrorist groups, and foreign terrorist leaders (including Abu Bakr al-Baghdadi, the current leader of ISIL); to inspire and encourage others to engage in violent jihad and/or pledge allegiance to ISIL and other

---

[1] On April 16, 2015, a federal grand jury returned a separate Indictment (15-CR-6052) charging the defendant with three counts of assault, in violation of 18 U.S.C. §§ 111(a) and 111(b). As part of the above-referenced plea agreement, this Indictment will be dismissed at the time of sentencing (provided that this Court accepts the plea agreement).

[2] The plea agreement and Pre-Sentence Investigation Report contain detailed summaries of the defendant's offense and relevant conduct.

foreign terrorist groups; to declare his support for establishment of the Islamic State; and to seek financial contributions to assist jihadist fighters.

By December 2013, the defendant had evolved from a vocal online supporter of ISIL to a recruiter. In the months thereafter, the defendant attempted to provide material support and resources – in the form of personnel (including Individual A, Individual B, Individual C, and a battalion of jihadist fighters located in Syria) – to ISIL. The defendant made these attempts knowing that ISIL was a designated foreign terrorist organization, and that ISIL had engaged, and was engaging, in terrorist activity and terrorism.

### Individuals A and B

In December 2013, the defendant began actively recruiting Individuals A and B – both of whom were cooperating with the Federal Bureau of Investigation (FBI) at the time – to travel to Syria to join and fight with ISIL. Earlier in 2013, before Individual B began cooperating with the FBI, the defendant had encouraged Individual B to travel overseas and engage in violent jihad with terrorist groups in Syria and Yemen.

In April 2014, based on ELFGEEH's repeated recruitment efforts, Individual A told the defendant that he had decided to make a flight reservation and travel to Syria to join ISIL by June 1 (2014). Two days later, the defendant advised Individual B that someone (Individual A) was leaving for Syria. The defendant told Individual B that it was a "big opportunity," and that, if Individual B traveled to Syria, Individual B would join ISIL. The defendant told Individuals A and B that he would find and arrange for a trustworthy ISIL contact in Syria for them.

In April and May 2014, the defendant took several actions to assist Individuals A and B with preparing for their travel to Syria to join ISIL. For example, the defendant provided two ISIL propaganda videos to Individual B, arranged for an English-speaking ISIL contact to speak with Individual B about the state of affairs in Syria, paid for Individual B to obtain a birth certificate and passport, purchased a laptop computer and high-definition camera for Individuals A and B to take to Syria, counseled Individuals A and B about techniques to avoid detection by government and law enforcement authorities during their travel, and advised Individuals A and B about the process for joining ISIL.

In late April and May 2014, the defendant communicated online with several overseas individuals (including a Chechen national in Turkey, a Jordanian national in Syria, and two Yemeni nationals in Yemen) in an effort to find an ISIL contact who could coordinate the logistics of the trip and the admission of Individuals A and B into ISIL-controlled territory. The defendant ultimately located and arranged for a Yemeni national, who was affiliated with ISIL and was a known jihadist facilitator in Yemen, to serve as the contact for Individuals A and B. Before the Yemeni national would agree to be the contact, he required someone to recommend or vouch for Individuals A and B. The defendant told the Yemeni national that he recommended Individuals A and B, and vouched for their trustworthiness. Based on the defendant's recommendation, the Yemeni national agreed to recommend Individuals A and B to ISIL. The Yemeni national described for the defendant the process for Individuals A and B to reach Syria to join ISIL. Specifically, he stated that Individuals A and B would first travel to Istanbul, Turkey, and then take a flight to Gaziantep, Turkey, which is a city in southeast Turkey near the northern border of Syria. After they arrived in

Gaziantep, Individuals A and B would communicate with the Yemeni national and he would put them in contact with ISIL in Syria. In late May 2014, the Yemeni national confirmed that the plans were in place for Individuals A and B to travel to Syria to join ISIL.

On May 28, 2014, the defendant gave Individual A the Yemen-based telephone number for the Yemeni national. The defendant told Individual A that the Yemeni national would be the contact for Individuals A and B during their trip to Syria. The defendant described the logistics of the trip to Individual A, stating that Individuals A and B would first travel to Istanbul and then take a flight to Gaziantep. The defendant instructed Individual A to contact the Yemeni national at the telephone number provided by the defendant when they arrived in Istanbul or Gaziantep, and reminded Individual A to be security conscious when communicating with the Yemeni national.

In a series of messages on May 28, 2014, the defendant told the Yemeni national that he "targeted [Individual B] and the cause and means worked and he sought guidance and finally accepted the proposition," meaning that the defendant had sought to radicalize Individual B (a Muslim convert) and convince Individual B to travel overseas to engage in violent jihad, and that it worked. The defendant told the Yemeni national that Individuals A and B would be traveling on June 2 (2014). The Yemeni national told the defendant to contact him when their flight departs so he could be prepared for their arrival.

### Individual C

In February 2014, the defendant became aware that Individual C, a Yemeni male located in Yemen, needed $1,500 to finance Individual C's travel from Yemen to Syria to join

and fight with ISIL. The defendant knew at the time that ISIL needed both personnel and money. Thereafter, the defendant made efforts to gather funds to send to Individual C. On February 12, 2014, the defendant showed a photograph of Individual C to Individual A and told Individual A that Individual C wanted to join ISIL and needed their support. The defendant told Individual A that he would get $500 to send to Individual C, and asked Individual A to find one or two others who would be willing to contribute money.

On February 22, 2014, the defendant sent $600 via Western Union from Rochester, New York, to Individual C in Aden, Yemen. The defendant sent the money to Individual C for the specific purpose of assisting Individual C in traveling from Yemen to Syria (through Turkey) to join and fight with ISIL. After the defendant sent the money to Individual C, Individual A exchanged Facebook messages with Individual C. In those messages, Individual C told Individual A, using coded language, that he would travel from Yemen to Syria as soon as he received his travel visa.

In late February 2014, the defendant told Individual C to either go to Syria to fight with ISIL or, if he could not arrange travel to Syria, use the money that the defendant sent to buy a weapon, stay in Yemen and fight with a militant group in his area. In early March 2014, the defendant learned that Individual C was unable to obtain a visa to Turkey.

### The Green Battalion of the United Rebels of Homs-Al-Murabitun

In early March 2014, a Syrian national (hereinafter "Syrian National 1") contacted the defendant via Facebook. The defendant knew Syrian National 1 to be a jihadist located in Homs, Syria, which is a city located in western Syria. Syrian National 1 told the defendant

that the Green Battalion of the United Rebels of Homs-Al-Murabitun (hereinafter "Green Battalion"), a jihadist group under the leadership of a commander, needed military support to break a blockade on Homs, which Syrian National 1 described as "at the edge of collapse." To break the blockade, the Green Battalion needed ammunition, mortar shells, and explosives that could penetrate armored vehicles. The defendant proposed to Syrian National 1 that the Green Battalion coordinate with ISIL to find a solution to the blockade. Syrian National 1 agreed to take the defendant's proposal to the fighters.

In a series of Facebook messages on March 6 and 7, 2014, the commander of the Green Battalion told the defendant that his battalion was blockaded inside Homs and was cut off from other active fighting units, noting that they had been subjected to a blockade in Homs for 21 months. The commander explained that the United Rebels of Homs-Al-Murabitun consisted of 16 fighting units, led by the Green Battalion. The commander stated that his group had tried to communicate with ISIL, but were unsuccessful. The commander sought the defendant's assistance in establishing communications and a relationship with ISIL. The defendant agreed to do so.

After his initial Facebook exchange with the commander, the defendant set out to find an ISIL contact on Facebook. In a series of Facebook messages on March 11, 2014, the defendant contacted a Syrian national of Chechen descent (hereinafter "Syrian National 2"), who was affiliated with ISIL. The defendant explained the commander's situation to Syrian National 2 and asked him to establish direct communications between the commander and ISIL leadership in Syria. Syrian National 2 proposed arranging direct communications between the Green Battalion commander and Abu Omar al-Shishani, the ISIL military

commander in Syria. Syrian National 2 agreed to connect the commander directly with ISIL leadership over Skype, and asked the defendant to send him the Skype address and name for the commander.

In a series of Facebook messages on March 14, 2014, the defendant told the Green Battalion commander that he found a contact that agreed to arrange direct communications with ISIL leadership over Skype. The following day, the commander sent his Skype address and the Skype address for his brother (who was in the northern rural area of Homs), to the defendant via Facebook. The defendant agreed to forward the addresses to ISIL.

On March 15, 2014, the defendant, using Facebook, sent the Skype addresses for the Green Battalion commander and the commander's brother to Syrian National 2. The defendant's purpose in sending the addresses to Syrian National 2 was to establish direct communications between the commander and ISIL leadership so that the commander, on behalf of the Green Battalion, could pledge allegiance to and join forces with ISIL, and so that ISIL could provide the Green Battalion with ammunition and weapons to break the siege on Homs. The defendant urged Syrian National 2 to put the commander in contact with high-ranking ISIL leaders and "be effective" in making the Green Battalion pledge allegiance to ISIL "to lift the siege on Homs."

In April 2014, the defendant learned that the Green Battalion commander had been "martyred," meaning he had been killed while engaging in violent jihad. Subsequently, in May 2014, the defendant learned that the Green Battalion was unable to coordinate with

ISIL and was unsuccessful in breaking the blockade in Homs. As a result, the Green Battalion had to withdraw from Homs.[3]

## II. STATUTORY AND SENTENCING GUIDELINES RANGES

Counts 2 and 3 of the Indictment each carry a maximum term of imprisonment of 15 years, a maximum fine of $250,000, and a term of supervised release of life. The aggregate statutory maximum sentence, therefore, includes a term of imprisonment of 30 years, a fine of $500,000, and lifetime supervised release.

In the written plea agreement, the parties set forth their calculations of the defendant's anticipated Sentencing Guidelines. Those calculations resulted in a total offense level 37 and a Criminal History Category of VI,[4] and an advisory sentencing range of 360 months imprisonment (in addition to any term of supervised release and fine that the Court may impose). The Pre-Sentence Investigation Report (PSR) agreed with the Sentencing Guidelines calculations in the plea agreement. On March 2, 2016, the government filed a "Statement With Respect to Sentencing Factors," in which the government stated its agreement with the Sentencing Guidelines calculations contained in the PSR.

As this Court is aware, the parties have agreed, pursuant to FED.R.CR.P. 11(C)(1)(C), that the sentence imposed by the Court shall include a term of imprisonment of 270 months (22 ½ years). The agreed upon sentence applies only to the term of incarceration and does

---

[3] Between March and May 2014, the city of Homs was under siege. The siege of Homs was a sustained military conflict between the Syrian military and the Syrian opposition forces (including the Green Battalion and other jihadist groups) in the city of Homs. The siege lasted approximately three years, from May 2011 to May 2014, and resulted in the withdrawal of the opposition forces from the city.

[4] The defendant does not have any prior criminal history. Nonetheless, pursuant to U.S.S.G. § 3A1.4(b), his Criminal History Category is VI because the offenses of conviction involve federal crimes of terrorism.

not affect the length or conditions of any term of supervised release. If the Court accepts and imposes the agreed-upon term of incarceration, the defendant may not withdraw his guilty pleas as a matter of right. If, however, the Court declines to impose the agreed-upon term of incarceration, the defendant has the right to withdraw his guilty pleas.

### III. STATUTORY SENTENCING FACTORS

As detailed above, the plea agreement contains an agreement pursuant to FED.R.CR.P. 11(c)(1)(C) that this Court sentence the defendant to 270 months imprisonment, as part of the appropriate sentence in this case. The government submits that such a sentence is appropriate and would not be "greater than necessary" to comply with the objectives set forth in Title 18, United States Code, Section 3553(a).

Title 18, United States Code, Section 3553(a) requires that the Court "impose a sentence sufficient, but not greater than necessary, to comply with the purposes set forth in [18 U.S.C. § 3553(a)(2)]." In determining the sentence, the Court must consider the following:

> (1) the nature and circumstances of the offense and the history and characteristics of the defendant;
>
> (2) the need for the sentence imposed--
>
>> (A) to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense;
>> (B) to afford adequate deterrence to criminal conduct;
>> (C) to protect the public from further crimes of the defendant; and
>> (D) to provide the defendant with needed educational or vocational training, medical care, or other correctional treatment in the most effective manner;
>
> (3) the kinds of sentences available;

(4) the kinds of sentence and the sentencing range established for–

    (A) the applicable category of offense committed by the applicable category of defendant as set forth in the guidelines--

        (i) issued by the Sentencing Commission pursuant to section 994(a)(1) of title 28, United States Code, subject to any amendments made to such guidelines by act of Congress (regardless of whether such amendments have yet to be incorporated by the Sentencing Commission into amendments issued under section 994(p) of title 28); and

        (ii) that, except as provided in section 3742(g), are in effect on the date the defendant is sentenced; or

. . .

(5) any pertinent policy statement–

    (A) issued by the Sentencing Commission pursuant to section 994(a)(2) of title 28, United States Code, subject to any amendments made to such policy statement by act of Congress (regardless of whether such amendments have yet to be incorporated by the Sentencing Commission into amendments issued under section 994(p) of title 28); and

    (B) that, except as provided in section 3742(g), is in effect on the date the defendant is sentenced.

(6) the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct; and

(7) the need to provide restitution to any victims of the offense.

18 U.S.C. § 3553(a).

In executing these statutory responsibilities, the Court is obligated to: (1) identify the Guidelines range supported by the facts; (2) treat the Guidelines as advisory; and (3) consider the Guidelines together with the other factors outlined in 18 U.S.C. § 3553(a). United States v. Ratoballi, 452 F.3d 127, 131-32 (2d Cir. 2006).

In this case, the crimes committed by the defendant – attempting to provide material support to ISIL – are exceptionally serious. In the written plea agreement, the defendant admitted to attempting to send three individuals (Individuals A, B, and C) to Syria to join and fight with ISIL. Additionally, the defendant admitted to attempting to assist the Green Battalion of the United Rebels of Homs-Al-Murabitun in Homs, Syria, in communicating and joining forces with ISIL. ISIL is a designated foreign terrorist organization that has been engaged in a campaign of brutal violence and deadly attacks in Iraq and Syria, and has inspired acts of violence throughout the world (including the United States and France). The defendant expressed his support for ISIL in 2013, and continued to do so until his arrest on May 31, 2014. The defendant sought to provide personnel to ISIL in order to further its objective of forming an Islamic State. The defendant engaged in this course of criminal conduct because he believed that an individual who helps or sponsors a fighter to engage in violent jihad receives the same religious rewards as the fighter himself.

It is important to note that, during the pendency of this prosecution, the defendant met with the FBI and prosecutors. In the meeting, the defendant gave a full accounting of his criminal activities, including his involvement in recruiting the individuals for ISIL. Notably, the defendant renounced ISIL and its methods during the meeting.[5]

The government submits that the recommended sentence of 270 months imprisonment is a fair and just sentence under the facts and circumstances of this case. Such a severe sentence – the equivalent of more than two decades in prison – adequately accounts for the nature and circumstances of the offenses of conviction, the history and characteristics

---

5 The PSR shows that the defendant also renounced ISIL, and confirmed that he no longer supports ISIL, in his statements to the Probation Office.

of the defendant, the seriousness of the offenses of conviction, and the need to protect the public from further crimes by the defendant. In addition, such a sentence would promote respect for the law and deter others in this District and elsewhere in the United States from seeking to provide material support to ISIL. For these reasons, the government recommends that this Court accept the agreed-upon sentence.

### IV. TERM OF SUPERVISED RELEASE

As this Court is aware, this case was not limited to the defendant's attempts to provide material support to ISIL. It also involved statements by the defendant expressing a desire to commit acts of violence in Rochester and the defendant's purchase of two firearms equipped with silencers from Individual B.

Considering the nature of the offenses of conviction and the other allegations in this case, the government requests that this Court impose a lifetime term of supervised release. The defendant is currently 32 years old. If the Court accepts the agreed-upon sentence in the plea agreement, the defendant will be at least 49 years old by the time he completes his prison sentence. The hope is that the defendant will leave prison a changed person, who will reject violence and continue to disavow ISIL (and other terrorist groups). Unfortunately, there is no guarantee that he will do so. The government respectfully submits, therefore, that a lifetime term of supervised release is necessary to guard against the defendant attempting to commit new violations of the law upon his release from prison. Such a term will serve to protect the public and deter the defendant, under the threat of re-incarceration, from committing new offenses against the United States.

## V.    CONCLUSION

Based on the foregoing, the government respectfully recommends that the Court accept the parties' agreement to a sentence of 270 months imprisonment. In addition, the government recommends that this Court impose a lifetime term of supervised release.

DATED:    Rochester, New York
                 March 7, 2016

                                                 Respectfully submitted,

                                                 WILLIAM J. HOCHUL, JR.
                                                 United States Attorney
                                                 Western District of New York

                          BY:     s/ Brett A. Harvey
                                                 BRETT A. HARVEY
                                                 Assistant U.S. Attorney
                                                 Western District of New York
                                                 100 State Street, Suite 500
                                                 Rochester, New York
                                                 (585) 399-3949
                                                 brett.harvey@usdoj.gov

TO:    Mark D. Hosken, Esq.
           Counsel for Defendant

           United States Probation Department
           Attn:   Kerry Chartier
                     Supervising U.S. Probation Officer